### UNITED STATES v. YELLOW CAB CO. et al.

#### No. 46 C 1339.

United States District Court
N. D. Illinois, E. D.
Nov. 1, 1948.

937

Melville C. Williams, George B. Haddock and Willis L. Hotchkiss, Sp. Assts. to Atty. Gen., for government.

Jesmer & Jesmer, of Chicago, Ill., for Cabs Sales & Parts Corp. and Checker Taxi Co.

Kirkland, Fleming, Green, Martin & Ellis, of Chicago, Ill., for Yellow Cab Co. and Chicago Yellow Cab Co.

Winston, Strawn & Shaw, of Chicago, Ill., and Gallop, Climenko, Gould & Lynton, of New York City, for Checker Mfg. Co. and Morris Markin.

Ringer, Reinwald & Sostrin, of Chicago, Ill., for Parmelee Transp. Co.

Harold S. Lynton, Jesse Climenko and Jack Ginsberg, all of New York City, of counsel, for all defendants.

LA BUY, District Judge.

The amended complaint in this action alleges that the defendants, commencing in early 1929, conspired in violation of Sections 1 and 2 of the Sherman Anti-Trust Act, 26 Stat. 209, as amended, 15 U.S.C.A. §§ 1, 2, to restrain and monopolize interstate commerce in (1) the sale of motor vehicles for use as cabs to the principal cab operating companies in Chicago, New York City, Pittsburgh and Minneapolis, and (2) the transportation of railroad passengers and their luggage between railroad stations in Chicago pursuant to contractual arrangements with railroads and railroad associations.

The original complaint additionally alleged that such conspiracy extended to the business of furnishing taxicab services for hire in Chicago, but this was deleted after decision by the Supreme Court that such taxicab services were local and not interstate commerce and that in this respect the original complaint failed as a matter of pleading to state a claim for relief. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010.

The defendant Checker Cab Manufacturing Corporation (CCM) manufactures taxicabs in Michigan and sells them to purchasers in various states. The defendant Yellow Cab Company (Yellow), all of whose stock is owned by the defendant

Chicago Yellow Cab Company, Inc. (Chicago Yellow), operates taxicabs in Chicago. The defendant Cab Sales and Parts Corporation (Cab Sales) also operates taxicabs in Chicago under licenses leased from Checker Taxi Company (Checker). The defendant Parmelee Transportation Company (Parmelee) owns all the stock of three subsidiaries which respectively operate taxicabs in New York City, Pittsburgh and Minneapolis. Parmelee also has contractual arrangements with railroads and railroad associations under which it transports railroad passengers and their luggage between railroad stations in Chicago. The defendant Morris Markin (Markin) is the president and general manager of CCM.

CCM was first incorporated in 1922 and has ever since manufactured a purpose-built cab. In 1923 its stock was publicly issued and in 1928 a second public issue was effected through the underwriting firm of J. A. Sisto & Co. Markin, in 1928, was the general manager and president of CCM, and CCM, in 1928, produced its Model K cab which received widespread acclaim.

In 1928 Ernest H. Miller, president of Yellow Taxi Corporation, New York, which operated "Yellow" cabs in New York City, initiated negotiations which led to Parmelee's formation. These negotiations, took place against a background of voluntary withdrawal commencing in 1925 by substantial interests of the "Yellow" organization in Chicago.

The Yellow organization in Chicago traces back to 1910. In 1925 its components included Yellow, Chicago Yellow and Yellow Cab Manufacturing Company, the last of which manufactured the "Yellow" purpose-built cab and supplied Yellow's cab requirements. In 1925, Yellow Cab Manufacturing Company was sold to General Motors Corporation, and shortly afterwards its name was changed, its plant was transferred, and it began to engage principally in the business of bus and truck manufacture.

In 1928 Miller informed Markin that persons owning substantial interests in Yellow Taxi Corporation, New York and Chicago Yellow desired to sell those interests. Miller asked Markin whether Markin could aid in arranging financing for such purpose. Markin consulted J. A. Sisto & Co., the underwriters through whom CCM earlier in 1928 had effected its public issue of stock. Negotiations ensued among Miller, Charles A. McCulloch, vice-president of Chicago Yellow and chairman of the board of The Parmelee Company, Markin, and J. A. Sisto & Co. in connection with which McCulloch also offered for sale stock of The Parmelee Company. J. A. Sisto & Co. investigated the proposed purchase, arranged for its financing and evolved the financial and operating structure of Parmelee.

Parmelee was formed April 12, 1929, with a capitalization of $10,600,000 consisting of $5,000,000 of debentures, $1,-000,000 of preferred shares, and 250,000 common shares of the value of $4,600,000. Only the common shares possessed voting power. The $5,000,000 of debentures and the 250,000 common shares were publicly issued through J. A. Sisto & Co. and White Weld & Co. as underwriters. The $1,000,-000 of preferred shares were purchased by CCM.

Shortly after its formation, Parmelee acquired 26 per cent of the stock of Chicago Yellow, 68 per cent of the stock of Yellow Taxi Corporation, New York, and 96 per cent of the stock of The Parmelee Company.

In connection with Parmelee's formation and the preceding negotiations, Markin, aside from discussions concerning CCM's purchase of Parmelee's preferred shares, acted in his personal capacity. Markin personally bought for himself and an associate 6 per cent of Parmelee's common shares. He also entered into an employment contract with Transportation Management Corporation, a newly formed and wholly owned subsidiary of Parmelee, to act as an adviser to Miller, president of Transportation Management Corporation. Markin's salary as such adviser was $25,-000 per year and Miller's salary as such president was $50,000 per year. Prior to his subscription to Parmelee's common shares and to his employment contract with

Transportation Management Corporation, Markin disclosed his personal negotiations to CCM, both at director and stockholder meetings, and requested a modification of his employment contract with CCM, under which he was required to devote his whole time to CCM's business, so that he might enter into this employment contract with Transportation Management Corporation. CCM recognized that Markin was acting in his personal capacity, and modified Markin's employment contract with itself to permit Markin to enter into this employment contract with Transportation Management Corporation.

In purchasing the $1,000,000 of Parmelee preferred shares, CCM hoped to receive, in addition to a profitable investment, the continuing good will of Parmelee as a potential customer for cabs. CCM declined, however, a prior offer to purchase common voting shares of Parmelee rather than the non-voting preferred shares because CCM desired the safer investment.

At Parmelee's formation, Markin was neither an officer nor a director of Parmelee or any of its affiliates; nor did Markin or CCM possess any control over Parmelee or its affiliates or any of their officers or directors.

During 1929 after Parmelee's formation both Yellow and Yellow Taxi Corporation, New York, purchased Model K cabs from CCM. No agreements, express or implied, were made, however, between CCM and Parmelee or any of Parmelee's affiliates for the exclusive or continuous purchase of CCM cabs; the 1929 purchases by Yellow and Yellow Taxi Corporation, New York, were limited to a specified number delivered that year.

Subsequent to Parmelee's acquisition of stock of Yellow Taxi Corporation, New York, and Chicago Yellow, Parmelee acquired the stock of two Pittsburgh taxicab operating companies, and later organized as a wholly owned subsidiary a Minneapolis taxicab operating company. These Pittsburgh acquisitions occurred in 1929 and neither Markin nor CCM participated in them. The organization of the Minneapolis taxicab operating company occurred in 1931 and followed the receiver-ship of a prior Minneapolis taxicab operating company owned by a local street railway company. Parmelee supplied $16,305 to purchase the receivership assets which subsequently were transferred to the Minneapolis corporation organized by Parmelee.

From the evidence the court finds that in 1929 neither CCM nor Markin possessed the power to compel Parmelee or any of its affiliates to purchase only CCM cabs; that in 1929 neither CCM, Markin nor any of the defendants formed an intent or plan to compel Parmelee or any of its cab operating affiliates to purchase only CCM cabs; and that in 1929 neither CCM, Markin nor any of the defendants formed an intent or plan to control commerce in the sales of cabs to any city or place.

At the time of Parmelee's formation Markin owned 12 per cent of CCM's stock and possessed no control over CCM's directorate. By mid-1930 Markin's ownership of CCM stock declined to 5 per cent, and of Parmelee's common stock to less than 1 per cent. At that time, CCM's largest stockholder was a group represented by John J. Raskob and Pierre duPont which owned more than 34 per cent of CCM's stock. This group and later duPont interests continued until mid-1933 to be CCM's largest stockholders. For several years thereafter representatives of Cord Corporation constituted the majority of CCM's directors. During none of this period was Markin in control of CCM.

In 1930 the following events occurred. J. A. Sisto & Co. was in financial difficulties as a result of the stock market crash of October 1929 and subsequent depression, and continued to hold without likelihood of public sale, $1,442,000 of the Parmelee debentures plus some Parmelee common shares and warrants. It sold these securities to CCM. Parmelee was incurring substantial losses, partly because of business conditions and partly because of a severe strike in Pittsburgh. Markin personally owned substantially all the stock of Motor Cab Transportation Corporation which he had previously formed and whose subsidiaries operated a large fleet of CCM cabs in New York City. The Raskob-

duPont group requested that Markin dispose of his Motor Cab stock so that he would not be, through this corporation, in competition with other New York City customers of CCM. Parmelee suggested that its financial strain would be eased if the $1,442,000 of debentures and the $1,000,000 of preferred shares of Parmelee then owned by CCM, carrying a current burden of interest charges, sinking fund requirements and cumulative preferred dividends aggregating over $330,000 yearly, were exchanged for Parmelee common shares. As a result of ensuing negotiations Markin, on the insistence of the Raskob-duPont group, transferred his Motor Cab stock to CCM in exchange for shares of CCM, and CCM transferred this Motor Cab stock plus all CCM's holdings of Parmelee debentures and preferred stock plus some incidental securities, to Parmelee in exchange for 422,787 Parmelee common stock. In consequence of this transaction, CCM in the latter part of 1930 became the owner of a majority of Parmelee's common stock. This transaction, however, was not related to any sales of CCM cabs to Parmelee or any of its taxicab operating affiliates and no accompanying intent or plan connected with any control over commerce in the sales of cabs existed on the part of any of the defendants.

At the present time, CCM owns 61.75 per cent of the stock of Parmelee, and Parmelee owns 29.5 per cent of the stock of Chicago Yellow and all the stock of three subsidiaries which respectively operate cabs in New York City, Pittsburgh and Minneapolis. Yellow, whose parent is Chicago Yellow, presently operates 1,595 licensed cabs out of 3,000 licensed and 950 temporarily licensed cabs in Chicago, or 1,595 out of an aggregate of 3,950. One of Parmelee's cab operating subsidiaries presently operates 1,932 licensed cabs out of 11,814 licensed cabs in New York City; another presently operates 485 licensed cabs out of 690 licensed cabs in Pittsburgh; and the third presently operates 125 licensed cabs out of 214 licensed cabs in Minneapolis.

Checker was formed in 1919 by a group of taxicab drivers who became its stockholders and operated their cabs under its common name. Checker performed services for these driver-stockholders, including telephone, cab stand, garage, repairs, insurance and the like, for which it received service payments. Orders from Checker for CCM cabs were among CCM's first orders in 1922. In 1925 a five year contract was made between CCM and Checker for the exclusive supply by CCM of Checker's requirements of cabs. Disputes occurred, however, with respect to this contract. These disputes were finally settled in 1930, after findings by a Special Master in CCM's favor, by the substitution of a new five year exclusive contract expiring in 1935.

Cab Sales was formed in 1930 as a method of compensating Paul C. L'Amoreaux, CCM's attorney in the CCM-Checker litigation. He became Cab Sales' sole stockholder and Cab Sales became entitled to receive a commission on CCM sales to Checker during the substituted five year contract. In 1931 Checker's president desired to withdraw from Checker and suggested the sale to Cab Sales of the majority of Checker's stock. Cab Sales thought this a good purchase and obtained for this purpose a substantial sum from Markin personally and loans from subsidiaries of Yellow. Numerous business factors unrelated to sales of cabs, and turbulent cab operating conditions in Chicago motivated this investment by Markin and these loans by subsidiaries of Yellow. Between 1931 and 1935 Checker continued its previous form of individual-driver operation. During this period, however, large arrearages accumulated in the service charges owing by the drivers and the drivers also defaulted on purchase installments of their cabs with the result that cabs were abandoned or Cab Sales was required to repossess them. In 1935 Cab Sales commenced fleet operation of 500 cabs within Checker. This was a minority of the total number of cabs operated within Checker but Cab Sales operated these 500 cabs as a fleet while the individual drivers of Checker operated their cabs individually. Between 1935 and 1941 the individual drivers gradually dropped out as a result of their difficulties of operation and their inability or unwillingness to pay their serv-

ice charges and purchase installments on cabs, so that by 1941 all "Checker" cabs were operated as a fleet by Cab Sales.

L'Amoreaux died in 1933 and since 1934 Markin has been the owner of substantially all the stock of Cab Sales. Since 1942 substantially all the stock of Checker has been owned by associates of Markin.

From the evidence, the court finds that Cab Sales did not acquire Checker's stock to compel the purchase of CCM cabs by Checker drivers or to control commerce in the sales of cabs to Chicago or elsewhere; and that the transition in Checker to a fleet operation was in adaptation to the difficulties confronting its individual-driver operation, and was not part of any intent or plan of any of the defendants to compel purchases of CCM cabs or to control commerce in the sales of cabs to Chicago or elsewhere.

At the present time Cab Sales operates 1,000 licensed cabs out of the aggregate of 3,950 licensed and temporarily licensed cabs in Chicago.

During the period 1929 through 1942 the cab operating companies affiliated with Parmelee, and Cab Sales have generally purchased only CCM cabs; between 1942 and 1947 CCM was engaged in war production and reconversion from war production and sold no cabs. In 1947 all the Parmelee cab operating affiliates, except in New York City, and Cab Sales replaced their fleets with pleasure cars manufactured by General Motors Corporation, Ford or Chrysler Corporation.

During the period 1922 through 1928 CCM manufactured and sold an aggregate of 8,019 cabs or an average of 1,336 cabs per year. During the period 1929 through 1942 CCM manufactured and sold an aggregate of 29,260 cabs or an average of 2,090 cabs per year. CCM's pre-1929 customers included all present cab operating companies under consideration in this action or one or more of their predecessors, except Yellow. Of the 29,260 cabs manufactured and sold between 1929 and 1942, 16,996 were sold to cab operating companies named in this action and 12,264 were sold to others.

The annual average number of taxicabs operated in the United States since 1928 is estimated at approximately 85,000. The bulk of these are manufactured by General Motors Corporation, Ford and Chrysler Corporation. The CCM cab has always been a purpose-built cab. The vehicles used as cabs which are produced by the large automotive manufacturers have generally been pleasure cars converted or adapted to use as taxicabs. A purpose-built cab is a vehicle built for the purpose of use as a taxicab; its essential characteristics are safety, assembly of parts in such manner as to afford low maintenance cost, driver appeal, and passenger appeal. During the period 1928 through 1942 CCM was the only manufacturer continuously engaged in the production of purpose-built cabs. The business judgment of Checker, Yellow and the cab operating subsidiaries of Parmelee has been that the CCM purpose-built cab better served their large city needs than converted pleasure cars.

Municipal regulation of taxicabs prevails throughout most of the large cities of the United States. In most of these large cities cab operations are conducted through fleets rather than as individual driver operations and in most a large proportion of the cab licenses are held by one or two operating companies. These fleet operations generally utilize a uniform cab and replacements are commonly obtained from the same manufacturer.

In Chicago taxicabs are regulated by ordinances of the City of Chicago. These ordinances control the physical requirements of the taxicabs and also establish and control the rates. Municipal regulations likewise control taxicabs and rates in the cities of New York, Pittsburgh and Minneapolis.

On May 9, 1853 Frank Parmelee formed the firm of Frank Parmelee & Company to specialize in the transfer by coaches of railroad passengers and their luggage between railroad stations in Chicago; in 1919 this firm became known as The Parmelee Company. Arrangements for such transfer service have existed continuously since 1853 between Parmelee or its predecessors and the railroads or railroad associations.

In the conduct of this inter-station transfer business Parmelee operates limousine coaches for passengers and trucks for luggage, and collects its compensation from the railroads. Passengers surrender to Parmelee coupons attached to their railroad tickets and furnished to them when they buy such railroad tickets. Their checked luggage is transported separately by Parmelee on trucks. Parmelee's routes between Chicago railroad stations are fixed. Its limousine coaches cannot be hired separately by any one person and passengers can travel only between railroad stations. Parmelee has offices at the several stations and its personnel is established and trained. Parmelee does not operate taxicabs for the general public in Chicago and is not subject to the taxicab ordinances of the City of Chicago.

Yellow, Checker and Cab Sales, however, have engaged only in the business of furnishing taxicab services for hire to the general Chicago public and their operations are subject to the ordinances of the City of Chicago. As part of their taxicab services for the general Chicago public, Yellow and Cab Sales furnish cab services to and from Chicago railroad stations. None of them has or has ever had limousine coaches or trucks or the type of personnel used by Parmelee and has never engaged in the kind of service rendered by Parmelee under its contractual arrangement with railroads and railroad associations.

On the evidence the court finds that the differences between these cab operating companies and Parmelee in equipment, personnel and services are such that competition with Parmelee for such contractual arrangements with railroads or railroad associations would be impractical and unlikely; that neither Yellow, Checker nor Cab Sales has ever agreed, expressly or impliedly, not to compete with Parmelee or not to engage in such inter-station transfer business; and that none of the defendants has ever, expressly or impliedly, forbidden Yellow, Checker or Cab Sales to compete with Parmelee or to engage in such inter-station transfer business.

In respect of sales of taxicabs the theory of the Government is that the defendants deliberately and calculatedly purchased control of taxicab operating companies in four cities in order to monopolize and restrain interstate sales of cabs to those cities. In considering the complaint as a matter of pleading the Supreme Court, United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010, thus stated this theory: "The theory of the complaint, to borrow language from United States v. Reading Co., 253 U.S. 26, 57, 40 S.Ct. 425, 432, 64 L.Ed. 760, is that 'dominating power' over the cab operating companies 'was not obtained by normal expansion to meet the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control.' If that theory is borne out in this case by the evidence, coupled with proof of an undue restraint of interstate trade, a plain violation of the Act has occurred."

Later, in United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, the Supreme Court said in reference to its decision in the Yellow Cab case: "In the complaint the government charged that the defendants had combined and conspired to effect the restraints in question with the intent and purpose of monopolizing the cab business in certain cities, and on motion to dismiss that allegation was accepted as true."

The evidence adduced at the trial consisted of voluminous documents as well as oral testimony. On consideration of the evidence as a whole it appears to the court that the Government's theory is not borne out by the proof.

From the evidence it appears to the court that the stock relationships which developed among the defendants were not part of a design to compel the purchase of CCM cabs and were not accompanied by an intent to control commerce in the sales of cabs to any of the four cities under consideration. The affiliations which occurred were occasioned by other business factors. Thus, without reviewing each instance, the status of Parmelee, which is

the pivot of the Government's theory, may be considered. At Parmelee's formation in April 1929, CCM not only was without any control over Parmelee but actually refused the opportunity to take common shares of Parmelee which possessed voting power, and took instead non-voting preferred shares of Parmelee. CCM's later acquisition, in the latter part of 1930, of a majority of Parmelee's common shares was the result of a series of supervening factors consequent on the stock market crash of October 1929, none of which could reasonably have been foreseen at Parmelee's formation and none of which was connected with sales of cabs by CCM to cab operating affiliates of Parmelee. During the entire depression period conditions of financial stress continuously beset cab operating companies in general and Parmelee in particular. Cf. International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 301, 50 S.Ct. 89, 74 L.Ed. 431. Nor did Markin possess any control over Parmelee or CCM. In the latter part of 1930 Markin's ownership of Parmelee shares declined to less than 1 per cent and his ownership of CCM shares to 5 per cent, which contrasts with an ownership of CCM shares of more than 34 per cent by the Raskob-duPont group. Raskob and duPont interests in CCM continued until 1933 and commencing in 1933 and continuing for several years afterwards Cord Corporation controlled CCM's management.

■ Since, on the proof, the stock relationships of the defendants did not arise as a result of a "deliberate, calculated purchase for control" over commerce in the sales of cabs, the affiliation of the defendants does not constitute a violation of the Sherman Act. United States v. Yellow Cab Co., supra, 332 U.S. at page 227, 67 S.Ct. 1560, 91 L.Ed. 2010; United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 937; United States v. Columbia Steel Co., supra.

■ Nor, on the evidence as a whole, does the proof show that the purchases of CCM's purpose-built cabs were made under compulsion or, except for the five year and substituted five year agreements between CCM and Checker expiring in 1935, under exclusive contracts. Included in the proof to the contrary are the sale to General Motors Corporation in 1925 of Yellow Cab Manufacturing Co. which manufactured the "Yellow" purpose-built cab, and the subsequent devotion of that company principally to the production of trucks and busses; the acclaim accorded in 1928 and 1929 to CCM's Model K cab; the practice even before 1929 of many of the cab operating companies under consideration or their predecessors of buying only purpose-built cabs; the status of CCM during the period since 1929 as the only manufacturer which continuously produced purpose-built cabs; and the tendency of cab operating companies usually to replace their fleets with cabs of the same manufacture. The government has suggested that pleasure cars, rather than purpose-built cabs should, perhaps, have been bought by the cab operating companies under consideration. This, however, is within the area of business judgment and, on the evidence it appears that the business judgment of these cab operating companies was that the CCM purpose-built cabs better served their large city needs than converted pleasure cars. In Yellow Cab Co. v. City of Chicago, 396 Ill. 388, at page 395, 71 N.E. 2d 652, at page 656, the Illinois Supreme Court thus referred to some of the advantages of operation in the City of Chicago of purpose-built cabs: "It further appears that there are certain advantages to the operation of taxicabs of special construction since they have many specially designed features for the safety, convenience and enjoyment of the passengers, and for easier operation on the public streets. Certain of these features are extra heavy frames, specially constructed bodies, specially designed brakes and steering mechanism, finger guards on door hinges, specially padded partitions, specially designed wheels, tires, ventilators and other features. Their weight is approximately 1,-000 pounds more than the average passenger car."

The evidence in the present case amply sustains the right of the cab operating com-

944

panies under consideration to determine, as a matter of business judgment, that the CCM purpose-built cab best suits their large city needs. This business judgment should not, on the evidence, be disturbed by the court. Under these business circumstances, it appears both reasonable and natural for these cab operating companies to buy the purpose-built cab produced by its affiliate.

■ In United States v. Columbia Steel Co., supra, 334 U.S. at page 523, 68 S.Ct. at page 1122, the Supreme Court said:

"Nothing in the Yellow Cab case supports the theory that all exclusive dealing arrangements are illegal per se.

"A subsidiary will in all probability deal only with its parent for goods the parent can furnish. That fact, however, does not make the acquisition invalid."

■ The evidence does not disclose any unreasonable restraint. An additional factor affecting any question of unreasonable restraint is the control by the four cities concerned through existing municipal regulations over the issuance of taxicab licenses, the physical specifications of taxicabs, and the rates of fare.

■ In respect of Parmelee's contractual arrangements with the railroads and railroad associations for inter-station transfer of railroad passengers and their luggage, the Government alleges that the defendants agreed that Yellow, Checker and Cab Sales would not compete with Parmelee for such contracts. No adequate proof supports this charge nor it is shown that the defendants ever forbade Yellow, Checker or Cab Sales, expressly or impliedly, from competing with Parmelee. Nor, in view of the evidence to the contrary, does any inference of an agreement of non-competition arise from Parmelee's continued contractual arrangements with the railroads and railroad associations after 1929. The historical relationship and the contractual arrangements of Parmalee and its predecessors with the railroads and railroad associations have been continuous for nearly a century. Exclusive contract arrangements have been sustained as valid. Donovan v. Pennsylvania Company,

199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192; United States v. Yellow Cab Company, supra, 332 U.S. at page 229, 67 S.Ct. 1560, 91 L.Ed. 2010. For years prior to 1929, the year of the commencement of the alleged conspiracy, Yellow and Checker operated taxicabs in Chicago without attempting to compete for such contracts with the railroads or railroad associations. Yellow and Cab Sales furnish taxicab services for hire to the general Chicago public. Their equipment, personnel and services adapted to this business differ from Parmelee's to such an extent that it would be "impractical and unlikely" for them to compete with Parmelee for its inter-station transfer business. United States v. Yellow Cab Co. supra, 332 U.S. at page 229, 67 S.Ct. 1560.

In arriving at the findings of fact made above this court has considered the various matters of proof presented; those not specifically mentioned in the findings have been deemed intermediate in the process of ascertaining the ultimate facts. Included in this category, for example, is the 1937 ordinance of the City of Chicago, under which the number of outstanding taxicab licenses in Chicago was reduced to 3,000. This ordinance, as its preamble recites, was plainly the result of a determination of public convenience and necessity, and the surrenders of licenses by Yellow and Checker in pursuance of this ordinance have, under the proof; no relation to any problems of sales of CCM cabs or inter-station transfer by Parmelee.

The court finds that the defendants have not combined or conspired to restrain or monopolize, and no unreasonable restraint or any monopolization was effected by any of them, and that they have not restrained or monopolized interstate commerce either in the sale of motor vehicles for use as cabs to the principal cab operating companies in Chicago, New York City, Pittsburgh or Minneapolis or in the transportation of railroad passengers and their luggage between railroad stations in Chicago pursuant to contractual arrangements with railroads or railroad associations.

Counsel will submit an order in accordance herewith.