**UNITED STATES v. INTER–ISLAND STEAM NAV. CO., Limited, et al.**

No. 887.

United States District Court
D. Hawaii.

Jan. 10, 1950.

Herbert A. Bergson, Assistant Attorney General, Jas. E. Kilday, Special Assistant to Attorney·General, Robert W. Strange, Special Assistant to Attorney General, Ray J. O'Brien, United States Attorney, District of Hawaii, Honolulu, T. H., for plaintiff.

Robertson, Castle & Anthony, Honolulu, T. H., J. Garner Anthony, Honolulu, T. H., for defendants.

McLAUGHLIN, District Judge.

### 1. The Facts.

With one or two amendments, which will be noted in their proper places, the Court accepts and, in condensed form, adopts plaintiff's statement of the facts as to which there is no genuine issue:

In 1929 the defendant Inter-Island Steam Navigation Company, Limited, hereinafter labeled Inter-Island, was a well and long established common carrier by water of freight and passengers in Hawaii. In that year it organized Inter-Island Airways, Limited, which later changed its name to Hawaiian Airlines, Limited, hereinafter called Hawaiian. Inter-Island caused Hawaiian to be incorporated as a common carrier by air and acquired a large majority of the latter's capital stock.

Inter-Island's purpose in organizing and acquiring control of defendant Hawaiian was to have it operate as a common carrier of passengers in Hawaii over routes substantially paralleling those over which Inter-Island then operated and to serve substantially the same areas that Inter-Island then served. Immediately after its organization, Hawaiian began so to operate and so to serve, and has continued to do so.

At all times since its organization, Hawaiian's capital stock has in the majority been owned by Inter-Island, which has controlled Hawaiian's operations as common carrier.

Except during World War II, Inter-Island since 1883 has continuously operated as a common carrier of freight and passengers, and Hawaiian since 1929 has continuously operated as a common carrier by air of passengers, except for a short period during World War II. Hawaiian has been also a common carrier of freight since 1942.

Plaintiff asserts in its statement of facts that Inter-Island and Hawaiian "have been and are in active competition for freight traffic," and that "As late as 1946, Inter-Island and Hawaiian had been and were in active competition for passenger traffic." While there is some testimony regarding certain intra-organizational rivalry between Inter-Island and Hawaiian in freight solicitation and passenger rate-making, such rivalry is not equivalent to the "competition" envisaged by the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

Furthermore, the complaint charges that defendants "have been parties to an unlawful combination and conspiracy to restrain and monopolize and have unlawfully attempted to monopolize and have unlawfully monopolized * *. * interstate and territorial trade and commerce in violation of Sections 1, 2, and 3 of the Sherman Act, in that" (B) they have jointly conducted so-called "all expense tours," and that Inter-

Island denies to other air carriers the privilege of making similar arrangements with it; and that (C) "Inter-Island persuades and induces prospective passengers to patronize Hawaiian in preference to other air carriers operating among the Hawaiian Islands."

In one breath, therefore, plaintiff alleges that the two defendants competed actively, and in the next it accuses them of combining, conspiring, and co-operating.

Finally, plaintiff concedes that this "competition" between Inter-Island and Hawaiian was "synthetic." Probably "illusory" would be the more accurate word.

Here it will clarify the issue for the Court to hold unequivocally that there never was any true competition between the defendants of the character that is protected by the Sherman Act. There can be no genuine competition between creator and creature, between parent and subsidiary. As was said in United States v. Columbia Steel Co., 334 U.S. 495, 523, 68 S.Ct. 1107, 1122, 92 L.Ed. 1533; "A subsidiary will in all probability deal only with its parent for goods the parent can furnish. That fact, however, does not make the acquisition invalid."

Concluding the recital of fact, the Court agrees with plaintiff in its assertions that air carriers and water carriers in Hawaii compete for the transportation of some kinds of freight; that Inter-Island and Hawaiian are engaged in interstate and territorial commerce, though the Court believes the interstate portion of the traffic is probably small; and that the public welfare in Hawaii requires that there be both air and water transportation of freight and passengers between the Islands composing the Territory of Hawaii.

## 2. The Pleadings.

For the purposes of this memorandum, and in the light of the preceding statement of facts, the pleadings need be summarized only briefly.

After setting forth the corporate history of the two defendants, most of which has already been outlined herein, the complaint sets forth that Inter-Island is required to file and does file its rates, fares, and regulations with the United States Maritime Commission, and that Hawaiian reports and is responsible similarly to the Civil Aeronautics Board. It is further alleged that in 1939, after the Civil Aeronautics Act of 1938, 49 U.S.C.A. § 401 et seq., became effective, Hawaiian secured under the grandfather clause of that Act a certificate of convenience and necessity, and has been operating since under that certificate.

Inter-Island was the only common carrier furnishing water transportation for both passengers and freight among the Islands. (In 1948 Inter-Island discontinued its passenger service, disposed of or laid up most of its fleet but continues to engage in the transportation of freight between the Islands by means of barge operations and one freighter which can carry but twelve passengers. There is and has been for some time a barge line engaged in transporting freight between the Islands, known as Young Bros., Limited.)

It is also stated that from time to time air carriers other than Hawaiian have undertaken to operate non-certificated non-scheduled flights for the transportation of passengers and freight, but that because of the "unlawful" acts of the defendants, some of the allegations regarding which have already been herein summarized, "these operations have been unsuccessful and have furnished no effective competition to" the defendants in such transportation. It should be noted here, however, that in 1948 the Civil Aeronautics Board granted Trans-Pacific Airlines a temporary five-year certificate as a common carrier by air, and since that time Hawaiian has had real competition for the carriage of passengers and freight between the Islands.

Plaintiff upon its allegations prays that the Court adjudge the conspiracy, the attempts to monopolize, etc., to be illegal and in violation of the Sherman Act; that Inter-Island be required to divest itself of all its interest in the capital stock of Hawaiian, and that none of that stock be sold to any stockholder, officer, etc., of Inter-Island or of any of its subsidiaries, etc., or to any stockholder, officer, etc., of any such subsidiaries.

It is also prayed that each of the defendants, its officers, agents, etc., be perpetually enjoined from monopolizing, attempting to monopolize, etc., air or water transportation in Hawaii, or from otherwise violating the Act. Simultaneously with the complaint a motion for a temporary restraining order and preliminary injunction was filed, asking that defendants be restrained from furthering or consummating a modified proposal for reorganization. The details of that plan need not be here set forth, except to say that the plaintiff's motion asserts that such modified plan would result in the control of Hawaiian passing from Inter-Island to Inter-Island's stockholders; that it would not have the effect of removing the defendants or their successors from the common control and management prohibited by the Act; and that if the plan of reorganization is consummated prior to the final adjudication of this case, plaintiff would be unduly burdened by having to commence and maintain an action against a "multitude of stockholders, changing in name and amount from day to day," etc.

In their answer, defendants admit a number of allegations contained in the complaint that have been incorporated in the foregoing statement of facts. They deny, however, the existence of any unlawful combination or conspiracy or the commission of unlawful acts, and assert as separate defenses that the complaint fails to state a claim upon which relief can be granted and that Inter-Island's control of Hawaiian "has been a matter of record among all of the agencies of the United States having to do with the transportation of freight, passengers and mail between points in Hawaii for many years last past." Upon this final allegation, the answer sets up the defense of laches, and asserts that since the formation of Hawaiian by Inter-Island there have been substantial changes of position by Inter-Island, with the result that the delay in bringing the action has been prejudicial.

The defense that this Court lacks jurisdiction over the subject matter has not been pressed, and is, indeed, devoid of merit. 15 U.S.C.A. § 4. Too, defendants' related contention that the matters complained of are within the primary jurisdiction of the Civil Aeronautics Board is likewise untenable.

Plaintiff has filed a motion, based upon certain affidavits attached thereto, for summary judgment in its favor, pursuant to Rules 56(a) and (c), Federal Rules of Civil Procedure, 28 U.S.C.A., on the ground that there is no genuine issue as to any material fact and that plaintiff is entitled to a judgment as a matter of law.

There is on record a stipulation by the parties, approved by the Court, that the Court may consider the record in the cause, including the evidence adduced at the hearing on the motion for a preliminary injunction, in the determination of plaintiff's motion for summary judgment. Each party, however, has reserved the right to object on the ground of relevancy.

In open court, counsel for defendants stipulated that they "are not going to divorce the Hawaiian Airlines from Inter-Island Steam Navigation Company until this Court has passed on this application for Preliminary Injunction." This, confirming a prior assurance of the same nature, the Court, with plaintiff's assent, accepted in lieu of deciding whether or not the issuance of a temporary restraining order was warranted.

### 3. Questions Presented.

I. Under the doctrine of stare decisis, is the District Judge sitting in this case bound to follow an oral ruling by another Judge of this Court, made in a private triple damage antitrust suit against the same defendants upon the precise question of law here presented?

II. Is there a violation of the Sherman Anti-Trust Act in the mere organization and control of a subsidiary air common carrier by a water common carrier for the purpose of having the former transport passengers over routes substantially paralleling the latter's routes and serving areas substantially similar to those served by the latter?

### 4. The Rule of Stare Decisis Is Not Ironbound.

On November 21, 1949, the Honorable Delbert E. Metzger, the Chief Judge of this Court, handed down an oral ruling in Civil No. 817 upon the $1,000,000 triple damage antitrust cross complaint of Trans-Pacific Airways versus Inter-Island and Hawaiian Airlines,[1] in which he stated that it was his "firm opinion that the creation of Hawaiian by Inter-Island to operate over routes that were parallel to its own operations at a time when it is said there was no air carrier competing in any way with Inter-Island, that that was a violation of the Anti-Trust Laws of the United States." And "in conformity with this conviction," Judge Metzger granted the Trans-Pacific Airlines' motion for summary judgment.

Defendants concede that the present case and the one in which Judge Metzger handed down his ruling "have one question of law in common, namely, whether or not the organization by Inter-Island of an airline in 1929 at a time when no actual or potential competition existed was a violation of the Sherman Act."

■ In its brief on this phase of the case, plaintiff cites decisions that it describes as holding "that judges should follow the earlier decisions of the same court in which the facts, issues and legal questions are substantially the same, unless the earlier decisions are clearly erroneous or there are cogent reasons why they should not be followed."

With this statement of the rule—including the limitations thereto—I am in complete accord, except that I believe there are still other exceptions to the doctrine of stare decisis. Those exceptions, together with the ones suggested by plaintiff, will now be considered.

(a) * * * *When There Are Cogent Reasons for Disregarding It*

While stability, consistency, and continuity are desirable qualities in the law, they are not qualities that are to be attained at the sacrifice of soundness and correctness—particularly when important rights are at stake.

■ In Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, 125 A.L.R. 1368, the Court said: "We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience."

Again, in Hertz v. Woodman, 218 U.S. 205, 212, 30 S.Ct. 621, 622, 54 L.Ed. 1001, we find the following language: "The circuit court of appeals was obviously not bound to follow its own prior decision. The rule of *stare decisis,* though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided."

See also United States v. Hirschhorn, D. C. N.Y. 21 F.2d 758, 759-760; Wallingford & Arango v. McCarty, D.C.C.Z., 69 F. Supp. 1000, 1005; 14 Am.Jur., Courts, §§ 78, 124, 125.

(b) * * * *Or When the Earlier Ruling Was Not a Final Judgment*

Of some relevancy, too, is the finality of the judicial pronouncement that is being invoked as binding upon the same court in a subsequent case.

■ In Posados v. Warner, Barnes & Company, 279 U.S. 340, 345, 49 S.Ct. 333, 335, 73 L.Ed. 729, this qualification to the rule of stare decisis was thus stated: "The doctrine of *stare decisis* does not apply with full force prior to decision in the court of last resort." See also 14 Am.Jur., Courts, § 74.

(c) * * * *Or When Each Side, If Unsuccessful, Intends to Appeal*

1. No opinion for publication.

■ It is a foregone conclusion that, no matter how this case is decided, it, like Civil No. 817, will be appealed. It is both interesting and significant that both sides quote from the same case dealing with this point—Jackson v. Northwest Airlines, D. C.Minn., 75 F.Supp. 32, 42: "This conclusion assumedly is contra to that reached in Anderson v. Federal Cartridge Corporation, D.C., 72 F.Supp. 644, by Judge Vogel, acting by assignment in this Court. But because one of the counsel in the Federal Cartridge case has informed the Court that an appeal in that case is contemplated, and because counsel for both sides in the instant cases intend to appeal the instant question in so far as it is adverse to their clients, this Court believes that the basic policy which dictates that decisions at least from the same district should be consistent may be suspended. Precedent from the same district should not be binding necessarily if both the counsel for the case establishing that precedent and the counsel for the case to which the precedent is sought to be applied intend to appeal the decisions promptly and directly to a higher court."

(d) *Conclusion*

■ As will appear, the conclusion which I reach upon the question of law ruled upon by Judge Metzger differs from his, and as this case obviously falls squarely within the exceptions to the rule of stare decisis, I shall dispose of this issue of law in this case upon the basis of the reasons which have led me to reach this contrary conclusion.

5. The Mere Parallelism of Routes Is Not Per Se a Violation of The Sherman Act.

Plaintiff's principal contention is that the "organization by (a) common carrier of a subsidiary to operate over substantially parallel routes is * * * a violation of the Sherman Act."

Since plaintiff concedes and even insists that it is not "the particular form of business organization effected, as it is the presence or absence of restraint of trade and commerce" that determines a violation of the Sherman Act, quoting from United

States v. General Motors Corporation, 7 Cir., 121 F.2d 376, 404, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, it is clear that the operation by the subsidiary air carrier of parallel routes constitutes the essence of plaintiff's objection.

In this connection, plaintiff refers to "naturally competitive routes." This characterization is reached by easy, gradual, and subtle steps from "naturally competitive" "common carriers," "roads or systems," or "lines."

Plaintiff first refers to decisions dealing with competitive *corporations* or *lines* established and operated by such corporations; and then it attempts to describe *natural routes,* while still in a virgin state, unexploited by man, as being "natural competitors" with each other.

■ Natural routes, before they are translated into operating transportation lines, are not "competitive" within the ambit of the Sherman Act. They are inert physical conditions incapable of competition. The mere establishment of a subsidiary to operate over such routes is not, *without more,* a violation of the statute, as restraining trade.

■ What *more* is actually required will be discussed later. For the present, it suffices to note that there is nothing in the Sherman Act that would compel Hawaiian, in order to avoid this bugbear of "parallelism," to route by way of Kauai any of its planes flying between Oahu and the Big Island! Being certified to fly only within or between the islands of the Territory, there is but one natural way to go to each island. The same is also true of surface carriers.

6. The Sherman Act Does Not Prohibit Normal Business Expansion

■ There is nothing in the statute to prevent a corporation from entering a virgin field, and, through a subsidiary or otherwise, engaging in a pioneer enterprise. That was precisely what was done in 1929 by Inter-Island in the instant case.

The antitrust laws were enacted to promote and not to retard the economic growth of the nation.

In a word, the Sherman Act is not an instrument of stagnation.

The Supreme Court repeatedly has given a clean bill of health to "an expansion to meet legitimate business needs." United States v. Paramount Pictures, 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260.

In United States v. Columbia Steel Co., supra, 334 U.S. at page 526, 68 S.Ct. at page 1123, 92 L.Ed. 1533, the Court, after outlining the "evils and dangers of monopoly" that both Congress and the Executive have sought to prevent, continued: "But no direction has appeared of a public policy that forbids, per se, an expansion of facilities of an existing company to meet the needs of new markets of a community, whether that community is nation-wide or county-wide."

And, had there been occasion to do so, Mr. Justice Reed might well have added, "or archipelago-wide."

See also United States v. Joint Traffic Association, 171 U.S. 505, 568, 19 S.Ct. 25, 43 L.Ed. 259; United States v. Reading Co., 253 U.S. 26, 57, 40 S.Ct. 425, 64 L. Ed. 760; United States v. Southern Pacific Company, 259 U.S. 214, 230, 42 S.Ct. 496, 66 L.Ed. 907; Appalachian Coals, Inc., v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825.

### 7. "The Rule of Reason".

The foregoing principles, so firmly imbedded in the decisions, would naturally lead us to expect that there must be some reasonable norm by which we can distinguish the expansions that impinge on the antitrust laws and those that are to be regarded as legitimate.

These expectations are borne out by the highest Court's decisions. In applying the Sherman Act, the Supreme Court has meticulously spelled out, by name, a "rule of reason."

█ The rule has been recognized and applied for more than half a century. A fairly recent expression of it, however, is to be found in Appalachian Coals, Inc., v. United States, 288 U.S. at pages 359-360, 53 S.Ct. at page 474, where Mr. Chief Justice Hughes used the following language: "*First.* There is no question as to the test to be applied in determining the legality of the defendants' conduct. The purpose of the Sherman Anti-Trust Act is to prevent *undue* restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape. *The restrictions the act imposes are not mechanical or artifical. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness.* They call for vigilance in the detection and frustration of all efforts *unduly* to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either *by making impossible the normal and fair expansion of that commerce* or the adoption of *reasonable* measures to protect it from injurious and destructive practices and to promote competition upon a sound basis." (Emphasis supplied.)

See also Hopkins v. United States, 171 U.S. 578, 600, 19 S.Ct. 40, 43 L.Ed. 290; United States v. Joint Traffic Association, 171 U.S. 505, 568, 19 S.Ct. 25, 43 L.Ed. 259; Standard Oil Co. v. United States, 221 U.S. 1, 63-64, 67-68, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 175-181, 31 S. Ct. 632, 55 L.Ed. 663; United States v. United States Steel Corporation, 251 U.S. 417, 452-453, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533.

If we were to construe the Sherman Act without recourse to the rule of reason obviously we should have to resort to the "mechanical or artificial" canons of construction that Mr. Chief Justice Hughes

1018

so clearly indicated were not appropriate. The rule of reason then would give way to the rule of unreason.

The plaintiff should be the last to urge that the rule of reason be discarded. A "mechanical or artificial" interpretation of the Sherman Act would be a double-edged sword that, in the long run, would cut against the Government more often than in its favor.

This has more than once been specifically pointed out by the Supreme Court. In United States v. American Tobacco Co., supra, 221 U.S. at page 178, 31 S.Ct. at page 647, 55 L.Ed. 663, Mr. Chief Justice White observed, in the course of his criticism of "construing the act by the rule of the lette which kills": " * * * while seeking by a narrow rule of the letter to include things which it is deemed would otherwise be excluded, the contention really destroys the great purpose of the act, since it renders it impossible to apply the law to a multitude of wrongful acts which would come within the scope of its remedial purposes by resort to a reasonable construction, although they would not be within its reach by a too narrow and unreasonable adherence to the strict letter."

See also Standard Oil Co. v. United States, supra, 221 U.S. at page 68, 31 S.Ct. at page 518, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann.Cas.1912D, 734.

### 8. The Rule of Reason Applies to Common Carriers.

This may be true as to persons engaged in interstate commerce generally, but, says plaintiff citing the "Railroad cases," it cannot be applied to common carriers. The rule of reason doesn't protect *them.*

Such, at least, is the only interpretation that I can place upon plaintiff's paraphrase of a dictum contained in Thomsen v. Cayser, 243 U.S. 66, 85, 37 S.Ct. 353, 359, 61 L.Ed. 597, Ann.Cas.1917D, 322. What the Supreme Court actually said was this: "The rule [of reason] condemns the combination of defendants, indeed, must have a stricter application to it than to the combinations passed on in the cited cases. The defendants were common carriers and it

was their duty to compete, not combine; and their duty takes from them palliation, subjects them in a special sense to the policy of the law."

Plaintiff asserts in its brief that the foregoing means that "the 'rule of reason,' as applied to common carriers, requires that they compete in full degree and that their public duties are such as to take from them the right to contend that such restraints as they may impose upon trade and commerce are reasonable."

I believe that plaintiff's construction of the foregoing paragraph is too sweeping, and that the Supreme Court meant merely that, in the case of common carriers, the rule of reason is more strictly applied against combinations.

However, even if we accept plaintiff's interpretation that the statement declares common carriers to be beyond the pale of the rule of reason, there are two reasons why the quoted paragraph in question is not controlling.

### (a) *The Statement Is Pure Dictum*

Examined in its factual setting, the statement from Thomsen v. Cayser so heavily relied upon by plaintiff is unquestionably obiter dictum. It was in no way necessary to the decision of the case.

The facts there showed a brazen high-handed violation of the antitrust laws. Various common carriers between New York and South African ports united under the name of "The South African Steam Lines," and distributed a *circular* promising to pay shippers by their lines 10% upon the net amount of freight at tariff rates received on shipments from the United States to Africa, *provided* such shippers patronized *exclusively* their lines to certain South African ports. Nor was the commission to be payable on the goods of any *consignee* who directly or indirectly imported goods by vessels other than those of the combining lines. Certain additional conditions were later prescribed that, according to the official statement of the case, were "intended to further restrain trade."

Two other companies, in the meanwhile, had entered the field, and not as members of the illegal combination. Defendants, to

prevent the newcomers from competing, increased the "commission" to "loyal" shippers, only upon the condition, among others, that the rates would be computed on those steamers—called "fighting ships" —that would come into direct competition with those of the independent newcomers.

In the paragraph immediately succeeding the one upon which plaintiff so stoutly relies, the Supreme Court referred to the defendants' "plan of evasion." And later on in the opinion the Court thus described the scheme: "And monopoly it was; shippers constrained by their necessities, competitors kept off by the 'fighting ships.'" 243 U.S. at page 87, 37 S.Ct. at page 360.

Elsewhere on the same page, this "constraint upon shippers" is emphasized by the Court.

Finally, it is to be observed that the Court *did* consider the question of "reasonableness." The jury had returned a verdict of damages against the defendants. 243 U.S. at page 74, 37 S.Ct. at page 357. On this point, the Court said, 243 U.S. at page 88, 37 S.Ct. at page 360: "The unreasonableness of the rate and to what extent unreasonable was submitted to the jury, and the verdict represented their conclusion."

Thomsen v. Cayser, supra, considered upon its facts is not controlling here. Such flagrant monopolistic practices would have been violations of the antitrust law had they been indulged in by the butcher, the baker, or the candlestick maker!

(b) *A Recent Supreme Court Decision Has Not Followed the Thomsen v. Cayser Dictum*

There is nothing in the so-called "Railroad Cases," upon which plaintiff basically relies, that indicates a belief on the part of the Supreme Court that the rule of reason should not be applied to combinations of common carriers.

It is, however, relevant to point out that a recent Supreme Court decision, handed down long after Thomsen v. Cayser, plainly has recognized the rule of reason as applicable to common carriers.

In United States v. Yellow Cab Co., 332 U.S. 218, 228–229, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010, the Court had before it, amongst other things, an allegation that there was a conspiracy to bring nearly all the taxicab companies of Chicago under common control, and to eliminate competition among them relative to contracts for supplying transportation for the transfer of passengers and their luggage between railroad stations in that city.

The following excerpts from the opinion clearly indicate both that this transfer of passengers was common carriage and that any combination affecting it was to be judged according to the rule of reason:

"The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. * * * That portion must be viewed in its relation *to the entire journey rather than in isolation.* So viewed, it is an integral step in the interstate movement. * * *

"Any attempt to monopolize or to impose an *undue* restraint on such a constituent part of interstate commerce brings the Sherman Act into operation. * * * Only Parmelee is free to attempt to procure such contracts; Yellow and Cab Sales are forbidden to compete for such contracts, despite the fact that they conceivably might provide the same transportation service at lower cost to the railroads. The complaint accordingly states a violation of the Sherman Act in this respect." (Emphasis supplied.)

This case was remanded to the District Court for further proceedings. Upon trial, the lower court found, amongst other things, that "no unreasonable restraint or any monopolization was effected by any of" the defendants in the transportation of railroad passengers between stations in Chicago. United States v. Yellow Cab Co., D.C.Ill., 80 F.Supp. 936, 944.

1020

The Government did not appeal from that part of the judgment, but took the case up to the Supreme Court on another point. The judgment was affirmed. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 70 S.Ct. 177.

On the point with which we are here concerned, therefore, the District Court decision remains a final and unreversed holding that the rule of reason *does* apply in a common carrier case.

■ And there is no sound principle in logic why this should not be so. While it is true that common carriers owe a high duty to the public, they are not, after all, outlaws.

9. To Constitute a Violation of the Sherman Act, Either There Must Be a Present Unreasonable Restraint of Trade—.

■ By far the majority of antitrust cases deal with acts that of themselves amount to an unreasonable restraint of trade—restraints that are illegal per se. In such cases, of course, a specific intent need not be shown. United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Columbia Steel Co., supra, 334 U.S. at pages 522 and 525, 68 S.Ct. at pages 1121, 1123, 92 L.Ed. 1533. Cf. United States v. Lehigh Valley R. Co., 254 U.S. 255, 267, 41 S.Ct. 104, 65 L.Ed. 253.

In the instant case, plaintiff so far has made no showing that defendants have committed acts or have engaged in any conspiracy that would be illegal per se.

10. Or There Must Be a Specific Intent to Accomplish an Unreasonable Restraint.

More difficult to analyze, however, are the situations in which no unreasonable restraint is achieved, but where there is found to be a specific intent to accomplish such a restraint.

■ The rule was concisely and lucidly expounded in United States v. Columbia Steel Co., supra, 334 U.S. at page 525, 68 S.Ct. at page 1123: "When a combination through its actual operation results in an unreasonable restraint, intent or purpose may be inferred; even though no unreasonable restraint may be achieved, nevertheless a finding of specific intent to accomplish such an unreasonable restraint may render the actor liable under the Sherman Act."

See also United States v. Union Pacific R. Co., 226 U.S. 61, 93, 33 S.Ct. 53, 57 L.Ed. 124; Appalachian Coals, Inc., v. United States, supra, 288 U.S. at page 361, 53 S.Ct. 471, at page 474, 77 L.Ed. 825; United States v. Yellow Cab Co., supra, 80 F.Supp. at pages 942 and 943.

■ Here again plaintiff so far has failed in its proof. It has adduced no evidence whatsoever of a specific intent on the part of defendants to impose any unreasonable restraint upon trade.

11. To Give Rise to Unreasonable Restraint, Either There Must Be Present Competitors—.

■ A typical case of restraint of trade under the Sherman Act is where A and B conspire to cripple or destroy the competition of C. C is in being at the time.

Most of the reported decisions deal with combinations between or against actual, existing competitors. Indeed, the words "competition" and "competitors" and "competing" run like a refrain through the cases dealing with the Sherman Act.

One variant type is where A and B combine to suppress competition with each other. Of such a type is Northern Securities Co. v. United States, 193 U.S. 197, 326–327, 24 S.Ct. 436, 48 L.Ed. 679, relied upon by Judge Metzger in Civil No. 817. Here again the principals existed.

See also United States v. Union Pacific, supra, 226 U.S. at pages 88 and 96, 33 S.Ct. at pages 58, 61, 57 L.Ed. 124; United States v. Reading Co., supra, 253 U.S. at page 58, 40 S.Ct. at page 432, 64 L.Ed. 760; United States v. Columbia Steel Co., supra, 334 U.S. at page 527, 68 S.Ct. at page 1124, 92 L.Ed. 1533.

Here again the facts do not support a charge of Sherman Act violation.

As pointed out in Hawaiian Airlines v. Trans-Pacific Airlines, D.C., 78 F.Supp. 1,

9, "it is reasonable to suppose that forming Hawaiian did not substantially lessen competition, as indeed prior to Hawaiian's entering the air transportation field in the Territory there was no competition to suppress."

## 12. Or There Must be Unreasonable Means to Discourage or Prevent Future Competition.

"The anti-trust laws," said Mr. Justice Douglas, in United States v. Griffith, supra, 334, U.S. at page 107, 68 S.Ct. at page 945, 92 L.Ed. 1236, "are as much violated by the prevention of competition as by its destruction."

See also United States v. Reading Co., 226 U.S. 324, at pages 348–349, 351–353, 370–371, 33 S.Ct. 90, at pages 95, 96–97, 103, 57 L.Ed. 243.

Yet, drastic and sweeping as the above rule seems, it has an important qualification that the Supreme Court has fully recognized, as we shall see.

## 13. Efficiency Alone Does Not Constitute "Unreasonable" Means of Discouraging Competition.

Does a man who builds a better mousetrap violate the Sherman Anti-Trust Act? ██ Plaintiff complains that "the organization of a subsidiary air carrier by a well financed and long established surface carrier would tend to preempt that field and to prevent future competition between the surface carrier and other air carriers."

But adequate capital and a long-time establishment in business are not proscribed by the Sherman Act. Just as it is not an instrument of stagnation, the Act does not penalize business efficiency, unless it be accompanied by some unlawful act. No unlawful act has been yet shown in this case.

This important qualification to the prevention-of-competition rule was clearly indicated in United States v. Reading Co., supra, 253 U.S. at page 57, 40 S.Ct. at page 432, 64 L.Ed. 760, cited—but not quoted—by plaintiff on this very point: " * * * obviously, this dominating power was not obtained by normal expansion to meet the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control."

There is shown in this case, of course, no "deliberate, calculated purchase for control." There was merely the creation of a convenient corporate subsidiary to pioneer a virgin field, where there were no competitors or any indication that there would be competitors for a long time to come.

Hawaiian not only built a better mousetrap, but the *first* mousetrap. Being the first in an untried and doubtful risky field is neither inherently evil nor prohibited, even when the pioneer venture is crowned with success.

## 14. Equity Principles Apply to Granting Relief Under the Sherman Act.

Just as a common carrier is not an outlaw from the rule of reason, so a Sherman Act defendant is not an outlaw from the principles of equity.

██ In Appalachian Coals, Inc., v. United States, supra, 288 U.S. at page 377, 53 S.Ct. at page 480, 77 L.Ed. 825, Mr. Chief Justice Hughes said: "The fact that the suit is brought under the Sherman Act does not change the principles which govern the granting of equitable relief. There must be 'a definite factual showing of illegality.' (Case cited.)"

As pointed out, there has been no "definite factual showing of illegality" in the instant case.

## 15. As to the Reorganization Plan, the Complaint Is at Best Premature

Plaintiff insists that "The reorganization would not terminate the common control of Hawaiian and Inter-Island and its corporate successor or any liability resulting from such common control."

██ If that is so, since present common control has not been shown to be unlawful, I am not disposed at this time to enjoin the carrying out of the proposed reorganization.

Since plaintiff seems to question the meaning of a statement made by me in open court during the course of the hear-

ing of the motions, I will repeat it here to clarify my position regarding the proposed plan of reorganization: "I have said, when we discussed this problem before, I have assumed the plan of reorganization is adopted in good faith, and I will further conclude as a matter of law that they will comply with the law, which they are presumed to know."

I adhere to this earlier statement.

If, however, during the carrying out of the proposed plan, plaintiff believes that the Sherman Act is being violated, the decree to be entered in conformity with this ruling will not prejudice recourse to the Court for any merited redress. At the present time, however, I hold that the motion for a preliminary injunction is premature.

The reasoning and the disposition of the appeal in Appalachian Coals, Inc., v. United States, supra, 288 U.S. at pages 377–378, 53 S.Ct. at page 480, 77 L.Ed. 825, are directly in point:

"We think that the Government has failed to show adequate grounds for an injunction in this case. We recognize, however, that the case has been tried in advance of the operation of defendants' plan, and that it has been necessary to test that plan with reference to purposes and anticipated consequences without the advantage of the demonstrations of experience. If in actual operation it should prove to be an undue restraint upon interstate commerce, if it should appear that the plan is used to the impairment of fair competitive opportunities, the decision upon the present record should not preclude the Government from seeking the remedy which would be suited to such a state of facts. We think also that in the event of future controversy arising from the actual operation of the plan the results of the labor of both parties in this litigation in presenting the voluminous evidence as to the industry, market conditions and transportaton facilities and rates, should continue to be available, without the necessity of reproducing that evidence.

"The decree will be reversed, and the cause will be remanded to the District Court with instructions to enter a decree dismissing the bill of complaint without prejudice and with the provision that the court shall retain jurisdiction of the cause and may set aside the decree and take further proceedings if future developments justify that course in the appropriate enforcement of the Anti-Trust Act."

It is urged that an injunction should issue now, for if after the reorganization of defendants' corporate structures there is need to have recourse to the Court, innumerable practical and legal difficulties would arise, as well as an unnecessary multiplicity of suits against countless stockholders. The law and the Rules of Civil Procedure are adequate to cope with such a situation if it comes to pass.

Furthermore such a contention is of no significance in the absence, as here, of present merit to plaintiff's position.

16. Laches.

While I agree with plaintiff's contention that the defense of laches cannot be urged successfully against the Government, I do not believe that the time element is thereby altogether ruled out of this case. Various Federal agencies for many years had detailed official knowledge of Inter-Island's control of Hawaiian, and yet no affirmative action was taken in any quarter until the institution of the present suit a little more than a year ago. Assuredly, such inaction for twenty years on the part of the Government must have lulled defendants into a sense of false security, to the effect that the Federal departments and agencies concerned did not regard the relationship between Inter-Island and Hawaiian as unlawful.

While such inaction is not a bar against eventual Government attack, I believe that it is nevertheless one of those imponderables that should be considered in arriving at a decision.

The language of the Court in United States v. United States Steel Corporation, 251 U.S. 417, 452–453, 40 S.Ct. 293, 299, 64 L.Ed. 343, 8 A.L.R. 1121, is apposite: "It [the Sherman Act] is clear in its denunciation of monopolies, and equal-

ly clear in its direction that the courts of the nation shall prevent and restrain them (its language is 'to prevent and restrain violations of' the act), but the command is necessarily submissive to the conditions which may exist and the usual powers of a court of equity to adapt its remedies to those conditions. In other words, it is not expected to enforce abstractions, and do injury thereby, it may be, to the purpose of the law. It is this flexibility of discretion—indeed, essential function—that makes its value in our jurisprudence—value in this case as in others. We do not mean to say that the law is not its own measure, and that it can be disregarded, but only that the appropriate relief in each instance is remitted to a court of equity to determine, not, and let us be explicit in this, to advance a policy contrary to that of the law, but in submission to the law and its policy, and in execution of both. *And it is certainly a matter for consideration that there was no legal attack on the corporation until 1911, 10 years after its formation and the commencement of its career. We do not, however, speak of the delay simply as to its time, or say that there is estoppel in it because of its time, but on account of what was done during that time—the many millions of dollars spent, the development made, and the enterprises undertaken; the investments by the public that have been invited and are not to be ignored."* (Emphasis supplied.)

### 17. Conclusion.

Plaintiff has failed to establish as a matter of law that it is entitled to a summary judgment, or that, as a matter of law and fact, it is entitled to a preliminary injunction. Accordingly, both motions are denied.

The denial of the motion for a preliminary injunction, however, is without prejudice to its renewal at some future date if, during and because of the carrying out of the proposed plan of reorganization, plaintiff deems such renewal necessary for the appropriate enforcement of the Sherman Anti-Trust Act.

However, to lay at rest plaintiff's fear that by the mere filing of this ruling, the defendants are released from their word given to the Court through counsel that the status quo as of the date of this suit would obtain until these two motions were disposed of, let it be clearly understood that this is not so, and that the Court will hold defendants to their word until the decree conforming to the rulings herein made is filed, after due notice and opportunity to be heard is accorded the Attorney General in Washington, D. C., and a reasonable time—to be settled—is also accorded him thereafter to proceed by way of appeal.