**PARMELEE TRANSPORTATION COMPANY, a Delaware corporation, Plaintiff,**

v.

**John L. KEESHIN et al., Defendants.**

**No. 56 C 323.**

United States District Court
N. D. Illinois, E. D.
June 30, 1960.

See, also, 144 F.Supp. 480.

534

Lee A. Freeman, John Paul Stevens, and Thomas C. McConnell, Chicago, Ill., for Parmelee Transp. Co.

Albert J. Meserow, Jerome F. Dixon and Theodore J. Isaacs, Chicago, Ill., for John L. Keeshin & Railroad Transfer Service, Inc.

Noah Walker, M. A. Garvey and D. J. Parker, Chicago, Ill., for Howard E. Simpson & B. & O. R. R.

Joseph H. Wright, Herbert J. Deany and Robert S. Kirby, Illinois Central R. R. Co., Chicago, Ill., for Wayne A. Johnson & Ill. Central R. R.

Robert H. Bierma and M. J. Haberkorn, Chicago, Ill., for Penn. R. R.

Marvin A. Jersild and Charles I. Hopkins, Jr., Chicago, Ill., for Marvin J. Keating & New York Central R. R.

F. O. Steadry and Edward Warden, Chicago, Ill., for Paul E. Feucht & Chicago & N. W. Ry. Co.

Thompson, Raymond, Mayer, Jenner & Bloomstein, Floyd E. Thompson, Albert E. Jenner, Jr., and Philip W. Tone, Chicago, Ill., for H. E. Simpson, P. E. Feucht, W. A. Johnson, F. G. Gurley, A. T. & S. Fe Rwy., B. & O. R. R. Co., Chgo. & N. W. Rwy. Co., I. C. R. R. & Penn. R. R. Co.

Floyd J. Stuppi, Chicago, Ill., for A. T. & S. Fe R. R.

Joseph C. Owens, Chicago, Ill., for Hugh W. Cross.

Amos M. Mathews, Chicago, Ill., for H. B. Siddall.

MINER, District Judge.

This is an action for an alleged violation of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2). Plaintiff is Parmelee Transportation Company,

which performed the interstation transfer of passengers and their baggage between and among Chicago's eight railroad stations for many years prior to October 1, 1955. The defendants are (a) John L. Keeshin, who was a successful competitor of Parmelee for a new contract to perform the service, commencing on October 1, 1955, (b) Keeshin's company, Railroad Transfer Service, Inc., which he organized to perform the service after he had been notified he would receive the contract, (c) Hugh W. Cross, formerly a member of the Interstate Commerce Commission, (d) the six railroads which comprised a committee chosen by the 21 railroads having passenger terminals in Chicago to consider the transfer problem and make recommendations to the railroads with respect to its solution, and (e) the presidents of four of the six railroads.

The complaint alleges, and the evidence shows, that 21 railroads operate passenger service terminating in Chicago at one of eight railroad stations. No railroad provides passenger service through Chicago. Thus, it is necessary for any through passenger arriving in Chicago by rail to transfer from one train to another and usually from one station to another. In order to provide a complete through service, the railroads provide transfer from one station to another for through passengers and their baggage, the outgoing line paying the transfer charge.

The evidence shows that early in 1954, as a result of a demand by Parmelee for a 19¢ increase in the coupon charge, the 21 railroads designated a committee of six of their number "to make a study of the transfer situation, including various types of operation that can be devised to definitely meet the needs of the public without increasing the cost to the railroads; report and recommendation to be made to Chicago terminal lines for consideration at a later meeting." (Proceedings of Meeting, Chicago Terminal Lines, Jan. 29, 1954.) The committee chosen consisted of the six railroad defendants,

being respectively the principal lines using the major terminals.

The evidence also shows that the committee representatives approached a substantial number of persons and firms which they thought were qualified and might be interested in rendering the transfer service, including John L. Keeshin, a substantial motor truck operator. The Committee held meetings with the various prospective bidders. Eventually, by reason of lack of interest on the part of other bidders or their unwillingness to provide the kind of service the railroads thought was required, the field was narrowed to Parmelee and Keeshin.

Keeshin's initial written bid was submitted on December 15, 1954. He proposed to render the service during the first year for $1.20 per coupon, which was 2¢ per coupon less than Parmelee was then charging. (Parmelee had been granted an increase to $1.22 from the $1.05 rate that was in effect at the beginning of that year, following the demand for rate increase referred to above.) Keeshin proposed that in the subsequent years his coupon charge would be increased 1¢ for each 5¢ per hour wage increase he was required to grant his employees. To permit him to amortize the investment necessary to entry into the business, he requested a five-year contract. On January 15, 1955, following an agreement covering wages of drivers for a three year period, Keeshin modified his proposal by placing ceilings of $1.22 and $1.23 per coupon in effect for the second and third years, respectively. Keeshin also proposed, in his original proposal, to provide new equipment, to replace his passenger equipment every thirty months, to air condition his passenger equipment and to dispatch his vehicles by means of two-way radios. He also agreed to make his books available for inspection by the railroads at any time.

On March 19, 1955, Parmelee submitted its proposal to the committee. Parmelee proposed to reduce its rate for the first year from the $1.22 it was then

charging to $1.20, the same figure Keeshin had offered; to increase the rate in subsequent years 1¢ for each 3¢ wage increase Parmelee was required to pay its employees; and, further, to increase the rate in subsequent years 1¢ for each 1% decrease in the number of passengers carried. Parmelee requested an exclusive six and one-half year contract, in order to permit it to amortize its anticipated investment in new equipment.

On April 6, 1955, Keeshin wrote a letter amplifying his previous proposal and stating that, while he recommended that trailers be used to handle baggage and that the railroads have their personnel load and unload stationed trailers as the more economical arrangement for them, he would be willing to continue the baggage handling system which had been in operation for many years with Parmelee. His letter also amplified various portions of his original proposal, but added nothing new in substance, except the assurance that his coupon charge was firm regardless of volume of passenger business.

On May 19, 1955, the committee met with Keeshin and Parmelee officials separately to discuss the respective proposals. Parmelee then withdrew its request that the railroads increase the coupon charge of 1¢ for each 1% decrease in passenger volume. However, Parmelee did not at that time put any ceiling on its charge for the second and third years, other than a ceiling of $1.25, which was applicable to each year of the contract period subsequent to the first. Parmelee did not offer air conditioning, radio dispatching or any schedule for equipment replacement, and declined to let the railroads see its books.

On May 20, 1955, Morris Markin, Chairman of the Board of Directors and principal negotiator for Parmelee, telephoned the chairman of the railroad committee, and advised him that Parmelee would place the following ceilings on its coupon charge: first year—$1.20; second year—$1.22; third year—$1.23; fourth year—$1.24; and balance of contract $1.25. Markin confirmed this change by letter.

The committee met on June 3, 1955, and unanimously voted to recommend to the 21 railroads that the proposal of Keeshin be accepted. On June 13, the 21 railroads approved the recommendation. Parmelee and Keeshin were notified of the railroads' decision.

Subsequently, Keeshin formed defendant, Railroad Transfer Service, Inc., for the purpose of performing the transfer service and the railroads negotiated and entered into a five-year written contract with that company for the performance of the service, operations under the contract to commence October 1, 1955. Railroad Transfer Service has been performing the transfer service since that date.

The foregoing facts are undisputed. The dispute concerns the means by which the railroads were induced to reach their decision to award the transfer contract to Keeshin rather than to Parmelee.

Parmelee alleges that Keeshin induced Cross, who was then a member of the Interstate Commerce Commission, to "influence, induce and persuade" the defendant railroads, and through them the 21 Chicago terminal lines, to accept Keeshin's proposal for a five year exclusive contract instead of Parmelee's proposal for a six and one-half year exclusive contract. (Complaint, par. 31)

These allegations are denied by all the defendants. The defendants contend that the proposals of Keeshin and Parmelee were considered on their merits and that the Keeshin proposal was selected by the railroads in the exercise of their sound business judgment.

Plaintiff's allegations of public injury, apart from the assertion that Cross was disabled as a result of his alleged undertaking from adequately performing his duties as a member of the Interstate Commerce Commission (Complaint, par. 34(i)), are that the services performed by Railroad Transfer are "more costly to said railroads and less extensive and valuable than the services previously performed by plaintiff and which plaintiff had offered to continue to perform" (pars. 33(f) and (i), 34(d)), and that

the travelling public will "ultimately" be affected by the alleged increased cost and will be "prejudicially" affected by the alleged decrease in the "quality or extent" of the service. (Complaint, par. 19) These allegations of public injury are denied by the defendants.

Plaintiff also alleges that it has been damaged by being deprived of profits in the sum of $6,400,000 "it would have earned" had it been awarded the contract. (Complaint, par. 35.) Plaintiff seeks a judgment in this amount trebled, or in the amount of $19,200,000, and seeks an injunction against performance of the contract or continuation of the alleged conspiracy.

In addition to the foregoing allegations of ultimate fact, Parmelee alleges that the acts of the defendants constituted an

"unlawful combination, conspiracy and concert of action to eliminate all competition for contracts * * * to transport interstate passengers and their baggage * * *, to eliminate all competition for the rendition of pick-up and delivery services, to foreclose all future competition for such contracts and services, and to restrain and monopolize the aforesaid interstate commerce in violation of Secs. 1 and 2 of the Sherman Act." (Par. 31)

Soon after the action was commenced, the defendants (with the exception of defendant Cross, who answered) filed motions to dismiss on the ground that the complaint failed to state a claim upon which relief could be granted. This motion was considered on briefs by Judge Philip L. Sullivan, to whom the case was then assigned, and overruled by him. The defendants who had filed motions then answered. Extensive discovery proceedings followed, during which thousands of pages of depositions were taken.

After discovery had been completed and after the first pretrial conference had been held before Judge Robson, to whom the case was then assigned, plaintiff moved for a partial summary judgment

holding the exclusive five-year contract which had been awarded Keeshin unlawful on the ground that it constituted, *per se*, a violation of the antitrust laws. This motion was considered by me on briefs, after the case was placed on my docket, and was overruled. The case was then set for trial.

In preparation for the trial, I reviewed the pleadings and briefs and other papers in the file and also certain pertinent decisions handed down after the briefs on the motion to dismiss were written. As a result of this review, I concluded that this might be an appropriate case for the operation of this Court's Rule 21, which implements Federal Rules of Civil Procedure, rule 42(b), 28 U.S.C.A., i. e., in which to order a separate trial of the separate issue of public injury. See Marks Food Corp. v. Barbara Ann Baking Co., 9 Cir., 1960, 274 F.2d 934, 936.

Shortly before the trial, the Court orally announced its views to the parties and asked that the parties present arguments to the Court on the question of whether a separate trial of the issue of public injury should be held. Both sides favored immediate trial of the entire case. Plaintiff opposed the separation on legal grounds, arguing that it was unnecessary for plaintiff to prove public injury as such; and defendants opposed the proposal on various practical grounds and on the ground that they desired to be vindicated by a trial on the merits. Notwithstanding the opposition of all parties, the Court concluded that it was in the interest of efficient judicial administration and in the interest of justice to try separately the issue of public injury.

Pursuant to the Court's order a jury was selected and impaneled to try the issue of public injury. Plaintiff and defendants introduced evidence on that issue. Plaintiff's position throughout the trial was that public injury was inferable as a matter of law from proof of a violation of the antitrust laws, that it was only necessary for plaintiff to prove a violation and that it was unnecessary to prove public injury as a separate element. On this theory, plaintiff made offers of

proof of its entire case, including the evidence it claimed established a violation of the antitrust laws and some evidence in support of its allegations of damages.

Defendants severally moved for a directed verdict at the close of plaintiff's evidence, and their motions were overruled. Both plaintiff and defendants moved for directed verdicts at the close of all the evidence, and these motions were overruled and the Court at the same time reserved its rulings. The issue of public injury was submitted to the jury by a special verdict which asked the jury to determine whether the award of the contract to Keeshin rather than Parmelee had resulted in injury to the public. The jury answered the question in the negative.

### Public Injury

■ Unless a *per se* violation of the antitrust law is established, plaintiff is required to prove that the public at large has suffered or will suffer economic harm as a result of the alleged violation, i. e., that there has been an appreciable lessening in the service or the availability of the products to the public or that the public has been deprived of a product or service of over-all superiority. Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 7 Cir., 1959, 273 F.2d 196, 200, certiorari granted 1960, 80 S.Ct. 1249 (in which the court viewed the complaint as not alleging a *per se* violation); Reliable Volkswagen Sales and Service Co., Inc. v. World-Wide Automobile Corp., C.C.H.Trade Reg.Serv., para. 69,644 (D. N.J.1960); United States v. Bitz, D.C. S.D.N.Y.1959, 179 F.Supp. 80.

■ For the reasons stated below in this opinion, the Court has concluded that neither the complaint nor the evidence and offers of proof, taking the latter as proved, charge or establish prima facie a *per se* violation of the antitrust laws. This case does not involve a boycott, as did Klor's, Inc. v. Broadway-Hale Stores, Inc., 1958, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. This appears not only from the complaint but from the evidence offered by plaintiff. Proceeding on the theory that proof of a violation of the antitrust laws without more, establishes public injury, plaintiff offered its evidence as to the conduct alleged to be a violation. This offered evidence, viewed in the light most favorable to plaintiff, does not establish, prima facie, a boycott or any other *per se* violation of the antitrust laws.

At the most it tends to prove that the railroads yielded to Cross' persuasions that Keeshin be selected as the transfer agent. There is no evidence or offer tending to show any agreement not to allow Parmelee to bid or not to consider Parmelee's bid or not to deal with Parmelee, except as any exclusive contract necessarily implies agreement not to contract with others.

Plaintiff, having failed to show, prima facie, a *per se* violation, was required to allege and prove public injury, even assuming the complaint charged a restraint of trade which, upon application of the rule of reason, might be held unlawful.

The Court finds that the public injury element, as specifically pleaded in the complaint herein, is an essential part of plaintiff's case in its action for treble damages for alleged violation of the antitrust laws, and that there is no violation by defendants unless their conduct under applicable principles of law, is adverse to the public interest.

Our courts have sustained exclusive and joint contracts upon the basis that the "combination" involved is an economically productive group, the formation of which promotes trade in the public interest (and, indeed, whose objectives may be accomplished in no other manner), or upon the ground that its lawful main objective justifies the creation of a joint venture which, as a single entity, cannot conspire with itself. (Cf. City of Chicago v. Atchison, Topeka & Sante Fe Ry. Co., 1958, 357 U.S. 77, 78 S. Ct. 1063, 2 L.Ed.2d 1174, in which both the majority and the minority of the Court recognized the right of railroads to act as a group in selecting a transfer operator to provide inter-station service. Id., 357 U.S. at pages 88–89, 78 S.Ct. at

pages 1069, 1070.) Where there can be but one successful bidder for a contract to serve a joint venture, the losers will not be heard to cry "conspiratorial exclusion." Many economically beneficial projects would be discouraged.

Joint or group action may be justifiable also in a context which is different from that of ordinary commercial matters. See United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 336, 72 S. Ct. 690, 96 L.Ed. 978; Riggall v. Washington County Medical Society, 8 Cir., 1957, 249 F.2d 266, certiorari denied 1958, 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed. 2d 530.

In Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 7 Cir., 1959, 273 F.2d 196, 200, certiorari granted 1960, 80 S.Ct. 1249, the Court reviewed many leading cases and concluded:

> "It is our opinion that the complaint also fails to allege such injury to the public as is essential to plaintiff's right to maintain its action. In the absence of a *per se* violation the Sherman Act protects the individual injured competitor and affords him relief, but only under circumstances where there is such general injury to the competitive process that the public at large suffers economic harm. Cf. Rogers v. Douglas Tobacco Board of Trade, Inc., 5 Cir., 266 F.2d 636. The primary purpose of the statute is to protect the public from monopoly."

In Klor's, Inc. v. Broadway-Hale Stores, Inc. et al., 1958, 359 U.S. 207, 210, 79 S.Ct. 705, 708, 3 L.Ed.2d 741, wherein the defendants, based upon affidavits, sought and procured summary judgment and dismissal of the complaint for failure to state a cause of action, the Court held:

> "We think Klor's allegations clearly show one type of trade restraint and public harm the Sherman Act forbids, and that defendants' affidavits provide no defense to the charges."

It reversed the Court of Appeals for the Ninth Circuit which affirmed the summary judgment, 255 F.2d 214, and held that the required public injury was missing since "there was no charge or proof that by any act of defendants the price, quantity, or quality offered the public was affected, nor that there was any intent or purpose to effect a change in, or an influence on, prices, quantity, or quality * * *." Unlike that case, which was decided on the complaint and affidavits, the case at bar was tried before a jury and the final judgment is entered upon that jury verdict and a complete offer of proof.

■ In the light of these principles, Section 4 of the Clayton Act (15 U.S.C.A. § 15), authorizing suits for treble damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," places upon the treble damage plaintiff the burden of establishing not merely his own damage but the actual or presumed harm to the public which is a prerequisite to a finding of Sherman Act violation by the defendant. In the latter respect, the allegations of a private claimant are no different than those required in a proceedings brought by the Government. Radovich v. National Football League, 1957, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456.

A complaint on its face may appear to allege price fixing, but upon close analysis of the proof it may be discovered that the conduct of defendants with respect to price may not spell out a *per se* offense. See United States v. Morgan et al., D.C.S. D.N.Y.1953, 118 F.Supp. 621, 688–691; Cf. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. Territorial restrictions may not involve illegal division of markets. United States v. National Football League, D.C. E.D.Pa.1953, 116 F.Supp. 319. And an apparent combination sale practice may lack the essential elements of an illegal tying arrangement. See Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Kohler, 1952–1953 Trade Cases, pars. 67,453, 67,553 (E.D.Pa. 1953). By the same token, the mere ap-

plication of the term "boycott" to a refusal to deal will not necessarily spell out the illegal group boycott condemned as *per se* illegal by the Supreme Court. See Encore Stores, Inc. v. May Department Stores Co., D.C.S.D.Cal.1958, 164 F.Supp. 82, 85. In consequence, the courts must be alert not only to protect the public from the economic harm of antitrust violation, but also to preserve the equally important freedom of individuals to exercise the individual initiative upon which our economy is based.

The standard for determining what combinations (and their activities) involve the prohibited degree of public harm is nowhere spelled out in specific terms. It is set forth in general terms in Chicago Board of Trade v. United States, 1918, 246 U.S. 231, at page 238, 38 S.Ct. 242, at page 244, 62 L.Ed. 683.

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

Under this "rule of reason", it is held, the Sherman Act does not prevent group "adoption of reasonable means to protect interstate commerce from destructive or injurious practices," Sugar Institute v. United States, 1936, 297 U.S. 553, 597–598, 56 S.Ct. 629, 641, 80 L.Ed. 859, nor prohibit "normal and usual contracts incident to lawful purposes and intended to further legitimate trade." Eastern States Retail Lumber Dealers' Ass'n v. United States, 1914, 234 U.S. 600, 609–610, 34 S.Ct. 951, 953, 58 L.Ed. 1490; Cf. Maple Flooring Mfrs.' Ass'n v. United States, 1925, 268 U.S. 563, 582–583, 45 S.Ct. 578, 69 L.Ed. 1093. Thus, trade associations may be established, and assuming that membership is reasonably open to all in the industry, they may limit their services to members. Moore v. New York Cotton Exchange, 1926, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750; Cf. Associated Press v. United States, 1945, 326 U.S. 1, 4–5, 24–25, 65 S.Ct. 1416, 89 L.Ed. 2013. Groups may also establish rules for trading which are binding upon the members, where these do not operate to prejudice the public interest. Chicago Board of Trade v. United States, supra; Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 1957, 244 F.2d 471, 482–483; Id., 5 Cir., 1959, 266 F.2d 636, certiorari denied 1959, 361 U.S. 833, 80 S.Ct. 85, 4 L.Ed.2d 75.

Similarly, terminal facilities may be established cooperatively under reasonable regulations and provided that they are made available on a non-discriminatory basis (United States v. Terminal Railroad Ass'n, 1912, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810); Cf. Associated Press v. United States, 1945, 326 U.S. 1, 25, 65 S.Ct. 1416, 89 L.Ed. 2013; and groups may take joint action within reasonable limitations in connection with such miscellaneous matters as insurance (Ruddy Brook Clothes, Inc. v. British & Foreign Marine Ins. Co., 7 Cir., 1952, 195 F.2d 86, certiorari denied 1952, 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635); credit terms (United States v. Cincinnati Fruit & Produce Credit Ass'n, 1956 Trade Cases, par. 68,248 (S.D.Ohio); Cf. United States v. First National Pictures, Inc., 1930, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151); public safety (Radiant Burners, Inc. v. Peoples Gas

Light & Coke Co., et al., 7 Cir., 1959, 273 F.2d 196, certiorari granted, 1960, 80 S.Ct. 1249; and selection of advertising media (District of Columbia Citizen Pub. Co. v. Merchants & Mfrs. Ass'n, Inc., D.C.D.Col.1949, 83 F.Supp. 994.

Justice Frankfurter pointed out in his concurring opinion in Associated Press v. United States, 1945, 326 U.S. 1, 27, 65 S.Ct. 1416, 1428, 89 L.Ed. 2013:

> "* * * ever since the Sherman Law was saved from stifling literalness by 'the rule of reason' * * * it is not sufficient to find a restraint. The decisive question is whether it is an unreasonable restraint. This depends, in essence, on the significance of the restraint in relation to a particular industry. Compare Chicago Board of Trade v. United States, 246 U.S. 231, 238 [38 S.Ct. 242, 244, 62 L.Ed. 683.]

Plaintiff has recognized its obligation to plead and prove public injury by alleging it in its complaint. Plaintiff alleged in substance that the service provided by Railroad Transfer was less extensive than, inferior to and more costly than the service which Parmelee had rendered and the service which Parmelee proposed to render. (Complaint, pars. 33(f) and (i), 34(d); and see par. 19.) These allegations were denied in defendants' answers.

The allegations that Cross was disabled as a result of his conduct from performing his duties as a Commissioner, is not an allegation of the kind of public injury the antitrust laws are designed to prevent. Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311; Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1954, 214 F.2d 891, 894, certiorari denied, 1954, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715.

It is unnecessary to discuss in detail in this opinion the evidence bearing upon the cost of the service, who bears that cost, the extent of the service and the quality of the service. These issues were determined by the jury adversely to plaintiff. Therefore, plaintiff has failed to meet its burden of proving public injury, an essential element of its cause of action in this private treble damage suit. Judgment should therefore be entered for the defendant on this ground.

### This Is Not An Antitrust Case

Other grounds exist which require the Court to enter judgment for the defendants. It appears as a matter of law from the facts alleged in the complaint, taken together with the proof introduced or offered at the trial, that no violation of the antitrust laws has occurred, even assuming that plaintiff's version of the facts is true. Plaintiff's claim does not fall within the family of antitrust violations. The facts charged, if proven, may amount to a violation of some other law or moral or ethical code, but they do not amount to a violation of the antitrust laws. This is so notwithstanding the conclusory allegations of the complaint as to conspiracy, elimination and foreclosing of competition, and restraining and monopolizing. It is the duty of the Court to consider the facts alleged, rather than "incendiary, yet vague, charges" characterizing those facts. Cf. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 834, 70 S.Ct. 894, 94 L.Ed. 1312.

The first question is whether the joint exclusive transfer contract was lawful, apart from the manner in which the selection of the transfer agent was made.

### The Legality of The Exclusive Five-Year Contract Entered Into By The Railroads Jointly

It must be recognized that in the passage of the years since the adoption of the Sherman Act, Congress has superimposed upon the general policy of competition there expressed additional policies with respect to what may be regarded as regulated industries. Thus, the Supreme Court pointed out in Federal Communications Comm. v. RCA Communications, Inc., 1953, 346 U.S. 86, 91–92, 73 S.Ct. 998, 1003, 97 L.Ed. 1470:

"That there is a national policy favoring competition cannot be maintained today without careful qualification. It is only in a blunt, undiscriminating sense that we speak of competition as an ultimate good. Certainly even in those areas of economic activity where the play of private forces has been subjected only to the negative prohibitions of the Sherman Law, this Court has not held that competition is an absolute. See Chicago Board of Trade v. United States, 246 U. S. 231 [38 S.Ct. 242, 62 L.Ed. 683]; cf. Mason, Monopoly in Law and Economics, 47 Yale L.J. 34."

It was not unlawful for the railroads to enter into an exclusive transfer contract with Railroad Transfer Service, Inc. In the first place, the contract entered into with that company was substantially the same as the contractual arrangements which had existed between the railroads and Parmelee for many years. I find that there is no genuine issue as to this. Parmelee dealt with the railroads as a group, the railroads made their contractual arrangements acting jointly (with the exception of one or two smaller railroads), and Parmelee's arrangements were exclusive (except for the transfer of certain special groups, such as baseball teams, as to which there is a dispute in an action pending in the Superior Court of Cook County, Illinois). The only difference between the two arrangements is that one was in writing and the other was oral.

The fact that the contract with Railroad Transfer Service, Inc. was for a term of five years does not render it illegal. Parmelee, who had had the exclusive contract for many years, sought a six and one-half year contract on the stated ground that such tenure was necessary to permit amortization of its contemplated investment in new equipment. The request of Keeshin, who as a newcomer had to purchase all the equipment necessary to carry on the business, for a five-year contract for the same

stated ground was not unreasonable. If it were, no newcomer could ever have challenged Parmelee's monopoly.

The Supreme Court has held that the exclusive contract between Parmelee and the railroads was not unlawful. In United States v. Yellow Cab Co., 1947, 332 U. S. 218, 228–229, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010, the court said:

"Parmelee's contracts are exclusive in nature. * * * It is true, of course, that exclusive contracts for the transportation service in question are not illegal."

See also the opinion of Judge LaBuy upon remand, United States v. Yellow Cab Co., D.C.N.D.Ill.1948, 80 F.Supp. 936, 944 and see also Donovan v. Pennsylvania Co., 1905, 199 U.S. 279, 295–297, 26 S.Ct. 91, 50 L.Ed. 192 (cited by the Supreme Court in the Yellow Cab case); Delaware, L. & W. R. Co. v. Town of Morristown, 1928, 276 U.S. 182, 189, 48 S.Ct. 276, 72 L.Ed. 523; Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 1928, 276 U.S. 518, 528–529, 48 S.Ct. 404, 72 L.Ed. 681; Depot Carriage & Baggage Co. v. Kansas City Terminal Railroad Co., C.C.W.D.Mo.1911, 190 F. 212, 214.

In City of Chicago v. Atchison, T. & S. F. Ry. Co., 1958, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174, in which the Court held invalid an ordinance of the City of Chicago which would have restricted the right of Railroad Transfer Service to operate on the city streets in performing the transfer service for the railroads, the Court again expressly recognized the propriety of the railroads acting as a group to select an exclusive transfer agent. In that opinion, the Court, speaking of the Chicago transfer problem, said (357 U.S. at page 79, 78 S.Ct. at page 1064):

"Because of the serious problems of scheduling and passenger convenience involved in this interchange, the railroads, as a group, have long provided for the transfer of through passengers from one station to another by a systematic and

highly organized motor carrier operation."

The Court in that case reviewed the applicable sections of the Interstate Commerce Act and held that the transfer service "is at least authorized, if not actually required," by the Act as a reasonable and proper interchange facility (357 U.S. at pages 85–86, 78 S.Ct. at page 1068). The Court said further (357 U.S. at page 88, 78 S.Ct. at page 1069):

> "Because of close time schedules, the great volume of traffic and its irregular ebb and flow, the railroads obviously need a cooperative and dependable transfer operator with suitable equipment who is willing to work in close harmony with them. The railroads have rejected as unsuitable the only transfer service now licensed to operate by the City. If local officials can prevent them from providing this service by some other means, a breakdown in the organized transfer of passengers could result. At a minimum they would be forced to deal once again with the rejected operator."

It is to be noted that Parmelee intervened in that case and that the six railroad defendants were parties plaintiff.

Even if it had not been decided by the express holdings of the cases first cited above that the railroads could properly enter into an exclusive transfer contract with a single transfer agent, this conclusion would follow from the Supreme Court's holding in the City of Chicago case that the service is authorized as a reasonable and proper interchange facility, which is in accordance with the holdings in Cederblade v. Parmelee Transp. Co., 7 Cir., 1948, 166 F.2d 554 and Commercial Zones & Terminal Areas, 48 Motor Carrier Cases 418 (1948). It is well settled that railroads have the right to combine their terminal facilities and to select a joint agent to operate such facilities. United States v. Terminal Railroad Association of St. Louis, 1912, 224 U.S. 383, 402, 410, 32 S.Ct. 507, 56 L.Ed. 810; Central Transfer Co. v. Terminal Railroad Association of St. Louis, 8 Cir., 1932, 61 F.2d 546, 550, affirmed 1933, 288 U.S. 469, 53 S.Ct. 444, 77 L. Ed. 899; Transfer in St. Louis and East St. Louis by Dray & Truck, 155 I.C.C. 129, 140, 143–144 (1929).

It follows that the railroads had the right to join together in selecting a transfer agent and in entering into an exclusive contract with that agent. The only question remaining is whether the railroads violated the antitrust laws by the manner in which they selected one of the two competitors for the contract.

### The Selection of the Transfer Agent

The facts which plaintiff alleges and which it either proved or formally offered to prove are as follows: Some time prior to March 15, 1955, Keeshin, for the purpose of having the contract awarded to him, induced Cross to persuade the defendant railroads, by promising favors to the railroads, to vote in favor of recommending that Keeshin's proposal for a five-year exclusive contract be accepted by the railroads instead of Parmelee's proposal for a six and one-half year exclusive contract. This is the substance of the charge which plaintiff offered to prove.

The Sherman Act did not require the railroads to award the contract to the lower bidder or to deal with Parmelee if they preferred to deal with Keeshin. Cf. City of Chicago v. Atchison, T. & S. F. Ry. Co., 1958, 357 U.S. 77, 88, 78 S.Ct. 1063, 2 L.Ed.2d 1174. Their selection of one competitor rather than another deprives the other of the opportunity to perform the service, i.e., to engage in the transfer business, and to that extent restrains interstate commerce, but such a restraint is not within the Act.

In Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 489, 60 S.Ct. 982, 84 L.Ed. 1311, it was contended that conspiracy of the defendant to stop the operation of the plaintiff's factory by means of a sit-down strike in order to enforce their demands against the plaintiff violated the Sherman Act. The Court rejected this contention, holding that a sit-down

strike, though it restrained the movement of goods in interstate commerce, was not the kind of restraint of commerce which the Sherman Act is designed to prohibit. The Court said (310 U.S. at pages 512–513, 60 S.Ct. at page 1002):

"* * * The Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combination and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its prices or discriminate between its would-be purchasers.' * * *

"If, without such effects on the market, we were to hold that the local factory strike, stopping production and shipment of its products interstate, violates the Sherman law, practically every strike in modern industry would be brought within the jurisdiction of the federal courts, under the Sherman Act, to remedy local law violations."

The authority of the Apex case on the point involved here is not impaired by the footnote comment on the case in Klor's, Inc. v. Broadway-Hale Stores, Inc., 1958, 359 U.S. 207, 213, note 7, 79 S.Ct. 705, 3 L.Ed.2d 741. There the Court was addressing itself to language in the opinion tending to support the proposition that effect on prices is essential to a Sherman Act violation. The Court did not question the fundamental holding of the case that conduct of the kind there involved was not within the scope of the Sherman Act, and that such conduct is not made into an antitrust violation by accompanying conduct which is illegal under some other law.

■ The awarding of a contract, which the awarding parties have a right to award on any basis they choose to one rather than to another competitor for the contract, is no more within the scope of the Sherman Act than is the sitdown strike of the Apex case. Each of these courses of conduct restrains trade in a sense. Neither constitutes a restraint of trade within the meaning of the Sherman Act, however. To hold otherwise would render the Sherman Act a lowest responsible bidder statute, which was plainly not the intent of Congress.

The automobile dealership cases are also pertinent. In Schwing Motor Co. v. Hudson Sales Corp., D.C.Md.1956, 138 F.Supp. 899, 900, the plaintiffs were former Hudson dealers whose dealership contracts Hudson refused to renew. Plaintiffs alleged that Hudson and the sole remaining Hudson dealer in Baltimore had conspired to eliminate the plaintiffs from competition with the remaining dealer in the sale of automobiles and parts. As the court stated it, the issue was "whether an agreement between an automobile manufacturer and a retail dealer, pursuant to which the manufacturer refuses to renew its expiring agreements with two other dealers, and gives the dealer a 'virtual monopoly' of the sale of one make of automobile in one city, is a combination or conspiracy to monopolize trade or commerce, or in restraint of trade or commerce, in violation of the Sherman Act and of the Clayton Act."

The issue in the Schwing case is very similar to that in the case at bar. It was there alleged that the successful dealer had induced Hudson to refuse to renew the plaintiff's dealerships, just as in the case at bar it is alleged that Keeshin with Cross' help induced the defendant railroads to award the contract to Keeshin's company rather than Parmelee, which meant that the railroads would "refuse to deal" with Parmelee. The substantial distinction between the two cases is that in the Schwing case the conduct of the defendants resulted in the remaining dealers receiving all of the business which had previously been divided among several competitors; while in the case at bar the business had always been in the hands of one firm because it was necessary for the railroads

to employ a single agent to perform the transfer service. Consequently, in the case at bar there was no change in the economic situation as a result of the conduct complained of.

The Court in the Schwing case held that the plaintiff failed to allege a violation of the Sherman Act, saying (138 F. Supp. at page 902):

"Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name. * * * A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the anti-trust laws."

The Court also pointed out (at page 903) that one has a right to deal with one person rather than another and may grant exclusive contracts which necessarily involve a limited monopoly in the area they cover, and that "such limited monopolies are not invalid * * * unless they are used to violate the anti-trust laws." Finally, the court said (at page 905):

"No horizontal conspiracy between competitors, no effort to extend the manufacturers' natural monopoly of its own product, no effort to establish market dominance and drive out the products of competitors is alleged."

These same principles apply in the case at bar. It is well settled that the railroads had the right to enploy an exclusive transfer agent to perform the transfer service, and that it is in the best interests of the public and the railroads to do so. The natural result of the exercise of this right is a limited monopoly in the hands of the agent selected to render the service. This limited monopoly or the alleged agreement between the successful bidder and the railroads with respect to it does not violate the antitrust laws in any way. There is no effort to extend the natural monopoly, no horizontal conspiracy between competitors, and no effort to establish market dominance.

The decision in the Schwing case was affirmed *per curiam* by the Court of Appeals for the Fourth Circuit, which adopted the opinion of the district court, 239 F.2d 176, certiorari denied 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38.

The same reasoning was followed in the very similar case of Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, certiorari denied 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38, in which the Court of Appeals for the District of Columbia reversed a decision of the District Court (135 F.Supp. 4) which was in conflict with the Schwing case. The court held that there was no attempt to create a monopoly, since there was no evidence of any attempt to get control of the relevant market, and that there was no contract or conspiracy in restraint of trade within the meaning of the Sherman Act. 243 F.2d at 420. The court also held that neither the fact that an exclusive arrangement of this kind eliminates other dealers in the same product of the same manufacturer nor the fact that the remaining dealer induced the manufacturer's decision to grant the exclusive dealership rendered the conduct complained of a violation of the Sherman Act. 243 F.2d at 421. See also Riedley v. Hudson Motor Car Co., D.C.W.D.Ky.1949, 82 F. Supp. 8; Federsen Motors, Inc. v. Ward, 10 Cir., 1950, 180 F.2d 519; Neumann v. Bastian-Blessing Co., D.C.N.D.Ill.1947, 70 F.Supp. 447; Hudson Sales Corp. v. Waldrip, 5 Cir., 1954, 211 F.2d 268 certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648.

The complaint also alleges that in order to induce the railroads to vote in favor of Keeshin's proposal, Cross promised to give them favorable consideration in matters pending before the Interstate Commerce Commission, and that he did give them favorable consideration. It is to be observed that these allegations found no support in plaintiff's elaborate offers of proof, which are assumed for present purposes to have been made in good faith and to state facts which plaintiff could prove.

However, apart from whether these allegations were or could be proved, they would seem to add nothing to the basic charge of plaintiff, which is that Keeshin induced Cross to persuade the railroads to award the contract to Keeshin rather than Parmelee. The fact that in so acting Cross or Keeshin or the railroads were violating some other statute, law, or ethical or moral code does not render their conduct violative of the antitrust laws if it is not otherwise so. Thus in Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L. Ed. 1311, the Court held that restraints which were not within the Sherman Act when achieved by peaceful means were not brought within the scope of the act because they were attended by unlawful violence. The Court said (310 U.S. at page 513, 60 S.Ct. at page 1002):

"The Sherman Act is concerned with the character of the prohibited restraints and with their effect on interstate commerce. It draws no distinction between the restraints effected by violence and those achieved by peaceful but often times quite as effective means. Restraints not within the act, when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence."

The same principle was applied in Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1954, 214 F.2d 891, 894, certiorari denied, 1954, 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715, in which the Court said:

"It is true that the conduct charged to the defendant was in fact antagonistic to the purpose of the patent laws, and that that purpose is a public purpose * * *. That, however, is not the kind of public purpose protected by the antitrust laws, which are designed instead to protect the free flow of interstate commerce."

In Arthur v. Kraft-Phenix Cheese Corp., D.C.D.Md.1937, 26 F.Supp 824, it was contended that an otherwise lawful refusal to sell at a dealer's discount was converted into a Sherman Act violation because it was designed to force the plaintiff to buy out a competitior who was indebted to the defendant, i.e., the conduct was for an improper motive. The court said (at page 828):

"Essentially what is complained of is a private wrong or common law tort in which the public interest is not involved. It is legally quite impossible to understand how the public interest could be concerned in this individual private controversy. There is nothing in the alleged facts to show that the motive of the defendant was to restrain trade or lessen competition and certainly nothing to show that the alleged unreasonable demand on the plaintiff could possibly have the effect of lessening the competition, or of raising prices or even maintaining prices. Nor is it alleged in even the most general terms that the transaction had any effect whatever on the volume of the defendant's business or the prices at which its products were sold. It is quite impossible to understand how the alleged act complained of would tend to promote or increase the defendant's monopoly of its own product. Every manufacturer has naturally a complete monopoly of his particular product especially when sold under his own private brands, and no private controversy with the distributor could legally tend to increase that type of a natural monopoly. The Sherman Act is, therefore, clearly not really involved."

Whether Keeshin or Parmelee was chosen to perform the transfer service, the transfer agent would have a monopoly in some sense. However, this is a lawful monopoly, as the Supreme Court has held. Its nature was not affected by the alleged improper inducement affecting the award of the contract.

A claim comparable with that of Parmelee was made in Hohensee v. Akron Beacon Journal Publishing Co., D.C., 171

F.Supp. 90; Id., N.D.Ohio 1959, 174 F. Supp. 450, affirmed, 6 Cir., May 13, 1960, 277 F.2d 359, in which it was alleged that the defendants had conspired to restrain the trade of plaintiff by slander, libel and other tortious acts. In holding that the complaint failed to state a claim upon which relief could be granted, the court said (171 F.Supp. at page 92):

"The Antitrust laws do not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce. Whether plaintiff has a cause of action for slander or libel is not a matter for determination in this action."

The Court cited Hunt v. Crumboch, 1945, 325 U.S. 821, 65 S.Ct. 1545, 89 L. Ed. 1954 in which the Supreme Court held that a labor union's refusal, motivated by a desire to punish plaintiff, to admit plaintiff's employees to membership in the union, thereby rendering it impossible for plaintiff to continue in business, was not a violation of the Sherman Act. Speaking for the Court, Mr. Justice Black said (325 U.S. at page 826, 65 S.Ct. at page 1548):

"That Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce."

See also Rossi v. McCloskey & Co., D.C. E.D.Pa.1957, 149 F.Supp. 638.

Accordingly, it would add no more to the conduct of Keeshin and Cross as violations of the antitrust laws if Cross promised the railroads favorable consideration in matters pending before the Interstate Commerce Commission, than if he had induced the railroads' action by threats of violence, blackmail or other means unlawful under some law other than the antitrust laws. It would add no more to the railroads' conduct, so far as the antitrust laws are concerned, that they were persuaded by promises of favors than if they acted through any other improper motive unrelated to those laws.

It would be no service to the Sherman Act, which plays such a vital role in preserving our free economy, to attempt to drag within its scope every kind of misconduct which seems to fit nowhere else. The purposes of that Act are best served by vigorous enforcement of it in the cases in which it was intended to apply, i.e., cases in which restriction or monopolization of trade or commerce are the object or the result of defendant's conduct.

It therefore appears from the facts alleged in the complaint and proved and offered to be proved at the trial that no violation of the antitrust laws has occurred. Judgment should be entered for defendants on this additional ground.